IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| CDMO, INC. AND CDET, INC. | |
| Plaintiffs, | |
| v. | CASE NO. 1:14-cv-00871-RPM-MJW |
| COMFORT DENTAL GROUP, INC., | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.  Introduction .................................................................................................... 1

II.  FACTUAL BACKGROUND ............................................................................. 3

    A.  Master Franchisor Agreements ......................................................... 4

    B.  Mandatory Laboratory Referral Program ("MLRP") ........................... 8

    C.  Gold Plan Program............................................................................ 11

III.  Argument ...................................................................................................... 13

    A.  Relevant State Laws and Regulations ................................................ 14

        1.  Corporate Practice of Dentistry and Control of Professional Judgment ................................................................................. 14

        2.  Insurance Laws Related to Discount Medical Plans and Prepaid Dental Plans ......................................................................... 17

    B.  Legal Standard for Issuance of a Preliminary Injunction. .................... 19

    C.  The Court Should Grant Injunctive Relief Because Plaintiffs Have Established All Four Factors Authorizing A Preliminary Injunction ................. 20

        1.  Plaintiffs Have a Substantial Likelihood of Success on the Merits with Respect to the Specifically Identified Provisions of the Contract ................................................................................. 20

        2.  Plaintiffs Will Suffer Irreparable Harm to Plaintiffs if the MLRP and Gold Plan Provisions Were Enforced. .............................. 27

        3.  The Balance of Harms and the Public Interest Favors Issuing a Preliminary Injunction. ........................................................... 31

IV.  CONCLUSION ............................................................................................... 32

# TABLE OF AUTHORITIES

FEDERAL CASES

*Bd. of Regents of the Univ. Of Okla. v. Nat'l Collegiate Athletic Ass'n*,
  546 F. Supp. 1276 (W.D. Okl. 1982).................................................................. 22

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*,
  167 F. Supp. 2d 1216 (D. Colo. 2001)............................................................... 20

*Bray v. QFA Royalties LLC*,
  486 F. Supp. 2d 1237 (D. Colo. 2007)............................................................... 32

*Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*,
  315 F.3d 1271 (10th Cir. 2003) ......................................................................... 14

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  269 F.3d 1149 (10th Cir. 2001) ......................................................................... 34

*Doubleclick, Inc. v. Paikin*,
  402 F. Supp. 2d 1251 (D. Colo. 2005)............................................................... 21

*Entek GRB, LLC v. Stull Ranches, LLC*,
  885 F. Supp. 2d 1082 (D. Colo. 2012)............................................................... 21

*Fairfield Cnty. Med. Ass'n v. United Healthcare of New England*,
  No. 3:13 CV 1621 SRU, 2013 WL 6334092 (D. Conn. Dec. 5, 2013) ............... 34

*Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)........................................................................... 21

*Greater Yellowstone Coal. V. Flowers*,
  321 F.3d 1250 (10th Cir. 2003) ......................................................................... 21

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ......................................................................... 21

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ......................................................................... 20

*Housworth v. Glisson*,
  485 F. Supp. 29 (N.D. Ga. 1978) ...................................................................... 34

*In re OCA, Inc.*,
  552 F.3d 413 (5th Cir. 2008) ............................................................................. 26

*Mason v. Orthodontic Crs. of Colo., Inc.*
  516 F. Supp. 2d at 1205 (D. Colo. 2007)........................... 23, 24, 25, 28, 29, 36

*Moore v. Subaru of Am.*,
  891 F.2d 1445 (10th Cir. 1989) ......................................................................... 14

*Multi Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
  22 F.3d 546 (4th Cir. 1994) ............................................................................... 35

*N.L.R.B. v. Express Pub. Co.*,
  312 U.S. 426 (1941)........................................................................................... 37

*O'Toole v. Northrop Grumman Corp.,*
   305 F.3d 1222 (10th Cir. 2002) .......................................................................................... 14

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
   861 F. Supp. 2d 1170(D. Haw. 2012) ................................................................................ 33

*Penny v. Orthalliance, Inc.,*
   255 F. Supp. 2d 579 (N.D. Tex. 2003) .................................................................. 17, 18, 25, 26

*RoDa Drilling Co. v. Siegal,*
   552 F.3d 1203 (10th Cir. 2009) .......................................................................................... 31

*Roso Lino Beverage Distrib., Inc. v. Coca Cola Bottling Co. of N.Y., Inc.,*
   749 F.2d 124 (2d Cir. 1984).............................................................................................. 33

*SMC Corp., Ltd. v. Lockjaw, LLC,*
   481 F. Supp. 2d 918 (N.D. Ill. 2007) ................................................................................ 35

*Winter v. NRDC,*
   555 U.S. 7 (2008) ............................................................................................................. 20

*Wojciechowski v. Amoco Oil Co.,*
   483 F. Supp. 109 (E.D. Wis. 1980).................................................................................... 33

*Wright v. Martek Power, Inc.,*
   314 F. Supp. 2d 1065 (D. Colo. 2004) ............................................................................. 14

STATE CASES

*Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.,*
   277 S.W.3d 686 (Mo. Ct. App. 2008)................................................................................ 27

*Com. v. Goodman,*
   No. 2001 CA 000694 MR, 2001 CA 000775 MR, 2003 WL 1255695 (Ky. Ct.
   App. Feb. 7, 2003) ................................................................................. 16, 25, 27

*Dawson v. Woodhams,*
   53 P. 238 (Co. App. 1898)................................................................................................ 20

*Denver & R. G. R. Co. v. Warring,*
   86 P. 305 (Colo. 1906)..................................................................................................... 15

*Equitex, Inc. v. Ungar,*
   60 P.3d 746 (Colo. App. 2002) ......................................................................................... 26

*F.D.I.C. v. Am. Cas. Co. of Reading, Pa.,*
   843 P.2d 1285 (Colo. 1992) ......................................................................................... 21, 22

*Hansen v. GAB Business Servs., Inc.,*
   876 P.2d 112 (Colo. App. 1994) ....................................................................................... 14

*Kendall v. Beiling,*
   175 S.W.2d 489 (1943)................................................................................................. 15, 28

*Metro. Life Ins. Co. v. Roma,*
   50 P.2d 1142 (Colo. 1935).............................................................................................. 21

4

*Newton v. Nationwide Mut. Fire Ins. Co.*,
  594 P.2d 1042 (Colo. 1979) ..................................................................... 22

*R.P.T. of Aspen, Inc. v. Innovative Commc'ns, Inc.*,
  917 P.2d 340 (Colo. App. 1996) ......................................................... 21, 23

*Russell v. Courier Printing & Pub. Co.*,
  95 P. 936 (Colo. 1908) ............................................................................. 33

*Trotter v. Nelson*,
  684 N.E.2d 1150(Ind. 1997) abrogated ................................................... 27

*U.S. Fid. & Guar. Co. v. Indus. Comm'n.*,
  61 P.2d 1033 (Colo. 1936) ........................................................................ 14

STATE STATUTES

Ind. Code Ann. §  27 13 34 ............................................................................. 28

Ind. Code Ann. §  27 17 12, sec. 1,2 .............................................................. 28

Ind. Code Ann. § 25 14 ............................................................... 15, 16, 25, 27

Ind. Code Ann. § 27 17 ......................................................................... 18, 19

Ind. Code Ann. § 27 17 12 .............................................................................. 19

Ind. Code Ann. § 27 17 14 .............................................................................. 19

KY. Rev. Stat. Ann. § 313.010(11) ................................................................. 16

Ky. Rev. Stat. Ann. § 313.070 ........................................................................ 25

Ky. Rev. Stat. Ann. § 313.070(1) (West 2014) .............................................. 15

Ky. Rev. Stat. Ann. § 313.080 (West 2014) ................................................... 25

Mo. Ann. Stat.  § 354.702(1) .......................................................................... 28

Mo. Ann. Stat.  § 376.1502(1) ........................................................................ 28

Mo. Ann. Stat. § 332.071 ............................................................... 16, 25, 27

Mo. Ann. Stat. § 332.071(11) (West 2014) .................................................... 15

Mo. Ann. Stat. § 332.071(ii) ........................................................................... 24

Ok. Stat. § 332.081 ......................................................................................... 25

Ok. Stat. § 332.111 ......................................................................................... 25

Ok. Stat. § 332.321 ......................................................................................... 15

Ok. Stat. § 354.702(1) ..................................................................................... 18

4818-6549-3529.8

# I.    INTRODUCTION

Plaintiffs CDMO, Inc. ("CDMO") and CDET, Inc. ("CDET") (collectively, "Plaintiffs") submit this Memorandum of Law in support of their Motion for Preliminary Injunction ("Motion").  Plaintiffs' Motion seeks to preliminarily enjoin Defendant Comfort Dental Group, Inc. ("Comfort Dental") from improperly enforcing illegal components in the Subfranchisor Agreements between the parties, including: 1) a Mandatory Laboratory Referral Program ("MLRP"), which mandates that all laboratory referrals from Plaintiffs' dentists in Missouri, Kentucky and Indiana be sent to Comfort Dental's Colorado dental laboratory; and 2) a mandatory Gold Plan marketing program ("Gold Plan Program"), in which Comfort Dental demands that Plaintiffs and their dentists all sell and advertise "discount medical plans" even though such plans are unregistered and potentially illegal.  Because Comfort Dental continues to demand that Plaintiffs engage in these potentially illegal practices, Plaintiffs seek to immediately enjoin enforcement of these provisions, and enjoin Comfort Dental from terminating Plaintiffs' franchises or otherwise penalizing them for failing to comply with Comfort Dental's illegal demands.

Comfort Dental should be enjoined from enforcing the MLRP because it impermissibly interferes with, and exerts control over, dentists' independent medical judgment and forces Comfort Dental dentists to place the financial interests of Comfort Dental's owners over the best interests of their dental patients.  The MLRP threatens irreparable harm by threatening to terminate Plaintiffs' franchise, and by demanding that they engage in potentially illegal conduct

1

which could expose them to penalties, professional licensure actions and damage to their patient relationships and reputations.

Comfort Dental's enforcement of Gold Plan sales should be enjoined because, by Comfort Dental's own admission, the Gold Plan has not been registered in any jurisdiction, and because sales of unregistered and improperly implemented dental plans are potentially illegal. Comfort Dental should be enjoined from forcing Plaintiffs to choose between engaging in illegal activity and losing their franchises.

Plaintiffs will likely succeed on the merits because Comfort Dental has clearly demanded that Plaintiffs either engage in potentially illegal conduct or risk losing their franchises. Because Comfort Dental's continuous and recent demands are undisputed, and because the conduct Comfort Dental demands clearly exposes Plaintiffs to legal risk, Plaintiffs are likely to succeed on the merits.

Comfort Dental's illegal conduct exposes Plaintiffs to immediate and irreparable harm. Comfort Dental's demands that Plaintiffs participate in the MLRP and sell the Gold Plan force Plaintiffs to make an impossible choice: lose their 25-year franchise or violate the laws of multiple jurisdictions.

Balanced against drastic harm to Plaintiffs lies only the improper economic benefit Comfort Dental's affiliated labs[1] receive from mandatory referrals, and through improper sales of the Gold Plan. Balancing these relative harms clearly favors entry of an injunction. Likewise,

---

[1] Because revenues for laboratory services are paid to Budge Dental Lab, LLC—a corporation separate from Comfort Dental—it is unclear what, if any, benefits Comfort Dental receives from the MLRP.

the public interest in avoiding illegality, especially acts that pose risks to dentists, patients, and consumers, favors entry of an injunction.

Accordingly, because Plaintiffs are likely to succeed on the merits, and because the irreparable harm imposed by enforcement of the MLRP and Gold Plan programs far outweighs any harm Comfort Dental would suffer if an injunction were issued, Plaintiffs' Motion should be granted. Plaintiffs, therefore, respectfully request that this Court enter a preliminary injunction as set forth in its Motion.

## II.    FACTUAL BACKGROUND[2]

Plaintiff CDMO is a Missouri corporation with its principal place of business in Kansas and CDET is a Wyoming corporation also with its principal place of business in Kansas. [Declaration of Craig Bahr ("Bahr Decl."), at ¶¶ 2, 3 attached hereto as **Ex. 1]**. Carl and Craig Bahr ("Bahrs") are brothers and licensed orthodontists. [Bahr Decl., ¶ 4]. Dr. Carl Bahr, through his controlled entity, BBROS, LLC, is the principal shareholder of Plaintiff CDMO; Drs. Carl and Craig Bahr are the principal shareholders of CDET. [Bahr Decl., ¶¶ 5, 6]. Defendant Comfort Dental is a Colorado corporation with its principal place of business in Lakewood, Colorado. [Bahr Decl., ¶ 7].

The Bahrs began their relationship with Dr. Rick Kushner, founder of Comfort Dental, in 2000, while still in dental school. [Bahr Decl., ¶ 8]. In December 9, 2003, the Bahrs entered into a Franchise Agreement with Comfort Smile, which they believed to be a sister corporation of

---

[2] The full factual background regarding the relationship between Plaintiffs and Comfort Dental is outlined in the Complaint (Dkt. # 1). In an effort to avoid unnecessary duplication, for purposes of this Motion for Preliminary Injunction, which seeks only limited relief related to two provisions within the contract between the parties, only the background relevant to those provisions is offered in this Memorandum.

Comfort Dental, to operate three franchises in the Denver metropolitan area. [Bahr Decl., ¶ 9]. Subsequently, in 2008, CDMO entered into an initial franchisor agreement with Comfort Dental to open Comfort Dental franchises in Missouri. [Bahr Decl., ¶ 10].

### A.    Master Franchisor Agreements

CDMO entered into the Master Franchise Agreement at issue here (the "CDMO Agreement") in February 2011. [Dkt. # 1, Ex. A]. CDET began its relationship with Comfort Dental when it entered into its Master Franchise Agreement (the "CDET Agreement") in July 2011. [Dkt. # 1, Ex. B]. Pursuant to the CDMO and CDET Agreements (collectively, "Subfranchisor Agreements"), Comfort Dental granted CDMO and CDET the right to offer subfranchises for the operation of Dental Offices using the Marks and the Licensed Methods within defined geographic areas pursuant to the terms and conditions of the relevant respective Agreements. The geographical area for CDMO was Missouri and the geographical areas for CDET were Kentucky and Indiana. [Dkt. # 1, Ex. A, § 1.3; Ex. B, § 1.3; Bahr Decl., ¶¶ 11, 12.]

CDMO and CDET began offering subfranchises to various subfranchisees in their respective geographical areas per the terms of the Subfranchisor Agreements. Bahr Decl., ¶ 13. CDMO's first subfranchisee in Missouri opened in February 2009, and CDET's first subfranchisees in Kentucky and Indiana opened in May 2011. [Bahr Decl., ¶¶ 14, 15]. Pursuant to the form agreements prepared by Comfort Dental that Comfort Dental contractually mandated that Plaintiffs use, CDMO entered into five (5) subfranchise agreements in the State of Missouri. [Dkt. # 1, Ex. C. Bahr Decl., ¶ 16]. CDET entered into one (1) subfranchise agreement in the

4

State of Kentucky and one (1) subfranchise agreement in the State of Indiana.  [Dkt. # 1, Ex. C. Bahr Decl., ¶ 17].

The Subfranchisor Agreements contain various terms that govern the rights and obligations of the parties.  Section 13.2 of the Subfranchisor Agreements provides that Comfort Dental reserves the right to "approve and/or designate, from time to time, manufacturers, vendors, distributors, suppliers, service providers and producers (collectively, "Vendors"), terms and distribution methods for any services and products (which include, but are not limited to, services, products, insurance, supplies, equipment and materials).  [Dkt. # 1, Ex. A, § 13.2, Ex. B § 13.2].  This section states CDMO and CDET "shall purchase all of the services and products required for the operation of the Subfranchisor Business . . . only from such approved Vendors under terms and in the manner designated by [Comfort Dental] or any of its affiliates."  [*Id*, Dkt. # 1, Ex. D].

The Subfranchisor Agreement contains a number of provisions by which Comfort Dental seeks to control virtually all aspects of the practice of dentistry engaged in by Comfort Dental dentists, including, among others, requirements that Comfort Dental approve all new subfranchisees [Dkt. # 1, Ex. A, § 4.4, Ex. B, § 4.4], that Comfort Dental Forms be used for all subfranchisee agreements [Dkt. # 1, Ex. A, § 4.2, Ex. B, § 4.2], that the subfranchisor undergo three days of Comfort Dental training (*including 1 day in "Master Franchisor's affiliate's lab"*) [Dkt. # 1, Ex. A, § 7.1, Ex. B, § 7.1], that the subfranchisees comply with all "standards and specifications for services and products offered by [subfranchisors] and the equipment and supplies used," [Dkt. # 1, Ex. A, § 13.1, Ex. B, § 13.1], that the subfranchisor ensure that no

5

subfranchisees "offer any good or service that is not expressly authorized in writing" by Comfort Dental [Dkt. # 1, Ex. A, § 13.4, Ex. B, § 13.4], and that each of the subfranchisors allow Comfort Dental to enter its premises, without notice, to inspect, audit and copy any records [Dkt. # 1, Ex. A, § 14.1, Ex. B, § 14.1].

In addition to the Manual and various contractual provisions, Comfort Dental, through continual written and oral directives and written and verbal training programs, attempts to direct the activities of Comfort Dental subfranchisees, including through the "Lean and Mean" instructions and testing, which all dentists are required to review and obey. [Dkt. # 1, Ex. E]; Bahr Decl., ¶ 20. The "Lean and Mean" system consists of a number of publicly available lectures given by Dr. Kushner over the past 15 to 20 years about how he thinks a dental office should be run. *Id.*

Comfort Dental requires in the Subfranchisor Agreements that "Subfranchisor shall comply with all applicable federal, state and local laws and regulations relating to the offering and sale of subfranchise opportunities within the Territory." [Dkt. # 1, Ex. A, § 13.5, Ex. B, § 13.5]. The Subfranchisor Agreements further state that CDMO and CDET:

> "shall ensure that all Subfranchisees in the Territory secure and maintain in force all required licenses, permits and certificates relating to the operation of the Dental Offices and shall operate the Dental Offices in full compliance with the Manual, all applicable laws, ordinances and regulations, including, without limitation, all government regulations relating to health and safety, occupational hazards and health, workmen's compensation insurance, unemployment insurance and withholding and payment of federal and state income taxes, social security taxes and sales and use taxes.")

*Id.*

6

The Subfranchisor Agreements may be terminated by Comfort Dental if one of the events listed in section 17.2 of the Subfranchisor Agreements occurs. [Dkt. # 1, Ex. A, § 17.2, Ex. B, § 17.2]. Notably, Comfort Dental may terminate the Subfranchisor Agreements if it determines that CDMO or CDET has "fail[ed] to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by [Comfort Dental]" unless such failure is cured within thirty days of Comfort Dental providing notice of such failure. [Dkt. # 1, Ex. A, § 17.2(e), Ex. B, § 17.2(e)]. The Agreements provide that either the Master Franchisor or Subfranchisor may seek "injunctive relief in appropriate cases to prevent irreparable harm." [Dkt. # 1, Ex. A, § 20.4, Ex. B, § 20.4].

Pursuant to the Subfranchisor Agreements, Comfort Dental requires use of a standard subfranchise contract. [Dkt. # 1, Ex. A, §§ 2.5, 4.2, Ex. B, §§ 2.5, 4.2]. The form subfranchise agreement mandated by Comfort Dental includes a provision that, among other things, makes Comfort Dental a third-party beneficiary to such Subfranchisee Agreement and gives Comfort Dental the "right, at its option, to independently enforce any term, condition or provision" of the Subfranchise Agreement. [Dkt. # 1, Ex. C, § 12.10].

The prescribed Subfranchisee Agreement provides for immediate termination (without advance notice or right of cure) if the subfranchisee "fails to purchase all items (e.g. . . . lab services) . . . from approved Vendors, including Budget Dental Lab[.]" [Dkt. # 1, Ex. C, § 9.1(a)(8).]

7

## B.     Mandatory Laboratory Referral Program ("MLRP")

Section 13 of the Subfranchisor Agreements mandates participation in the MLRP.  [Dkt. # 1, Ex. A, § 13, Ex. B, § 13].  In the MLRP, Comfort Dental has mandated that Plaintiffs and all Comfort Dental dentists utilize its Comfort Dental Labs, which are owned and controlled by Comfort Dental's principals and referenced in the Subfranchisor Agreements as "affiliated labs."[3]  *Id.*

Dental laboratories such as the Comfort Dental Labs manufacture or customize various products relating to the treatment of dental patients, including dentures, bridges, crowns and related devices.  [Bahr Decl., ¶ 21].  Dental laboratories play an integral part in the provision of dental care, and are important to patients' oral health, physical comfort and appearance.  [Bahr Decl., ¶ 21].  Problems with the quality, appearance, fit and timeliness of dental devices prepared by these laboratories adversely affects patients' dental health and damages dentists' relationships with their patients.  [Bahr Decl., ¶ 21].

Pursuant to Section 13.2 of the Subfranchisor Agreements, Comfort Dental mandates that all Comfort Dental dentists refer—in all 11 states—all dental laboratory work to the Comfort Dental Labs.  [Dkt. # 1, Ex. A, § 13.2, Ex. B, § 13.2].  Comfort Dental has repeatedly emphasized that mandated lab referrals and revenues from the Comfort Dental Labs are critical to the Comfort Dental business, and that Comfort Dental "does not survive without the lab[s]." [Bahr Decl., ¶ 23].

---

[3]  Budget Dental Lab, LLC, is a Colorado corporation based in Lakewood, Colorado and owned by M'KNIB Company, which in turn, is owned by Comfort Dental CEO Rick Kushner, Barry Kushner, Roy Martin, Neil Norton, C. Michael Bloss, and Bruce Irick.  Budget Dental Lab, LLC, is a Colorado corporation based in Lakewood, Colorado and owned by M'KNIB Company, which in turn, is owned by Comfort Dental CEO Rick Kushner, Barry Kushner, Roy Martin, Neil Norton, C. Michael Bloss, and Bruce Irick.  [Dkt. #1, ¶ 54].

8

On multiple occasions, Comfort Dental has sent written directives and warnings to CDMO and CDET and/or affiliated dentists demanding that they refer only to the Comfort Dental Labs, and regularly threatens and intimidates dentists who sought to exercise their own independent judgment by referring to other, higher quality laboratories.  [Bahr Decl., ¶ 20].  For example, on July 31, 2012, Dr. Kushner warned Plaintiffs and their dentists about not referring to the Comfort Dental Labs, and about acting "independently":

> I was recently made aware of your *franchise violation* regarding sending unapproved lab work out of the organization.  I expect that the violation was relatively minor[.]  Nevertheless, I would like to add my disappointment in your actions.  It always saddens and concerns me when a Comfort partner acts like any other 'hot dog' dentist and feels he/she can act independently of the organization . . . I am confident that all of our parties understand that Comfort's *mandatory in-house lab concept is one of a tiny few massive difference makers for us* . . . In addition to the legal penalties for your violation, I feel an obligation to show this example to all of our partners for their edification.  Additionally, your partnership will be scrutinized going forward for additional franchise violations.

[Dkt. # 1, Ex. E-1]

On August 30, 2012, Graig Bears, corporate counsel for Comfort Dental, warned Plaintiffs and Comfort Dental dentists as follows:  "[R]ight now the corporate office is dealing with an office that has been using a non-Budget/Premier dental lab.  It is not a one-time or even sporadic use but rather continued, extensive use.  *The punishment is going to be severe*.  Please, if any of you are using an outside lab, stop now.  The money saved is not worth *losing your franchise*."  [Dkt. # 1, Ex. F].

Comfort Dental's exclusive referral mandate has continued throughout 2013 and 2014, as have the public and intimidating threats made by Comfort Dental that referrals to superior labs could lead to the termination of their franchise or other "severe punishments."  As recently as

February 21, 2014, Comfort Dental CEO Kushner again e-mailed Plaintiffs and their dentists, demanding they use Comfort Dental Labs ("Kushner Demand Letter"), stating:

> "[I]n order to avoid violating your franchise agreement and the enforcement that would have to follow, *you must continue to honor all of your obligations, including use of the labs, Gold Plan and accounting services* for your business."

(emphasis added) [Dkt. # 1, Ex. G].

Comfort Dental not only has threatened, intimidated and/or terminated dentists for exercising independent medical judgment as to referrals of lab services, Comfort Dental also penalizes dentists who use their independent clinical judgment to request remakes of defective work performed by the Comfort Dental Labs. Indeed, Comfort Dental fines and penalizes dentists for ordering too many remakes and refers to this penalty as a "remake fine" or "lab penalty." [Dkt. # 1, Ex. H]. Indeed, Dr. Kushner stated as follows:

> Please see the enclosed remake report and my message of July, 2010. As you can see, two (2) offices . . . failed to meet my remake requirement of 12% for the third quarter. Therefore, *they are subject to a 10% penalty* on their lab bill for October, November and December. Other offices, as you can see, were very close to being *penalized*. This penalty will be billed . . . under '*lab penalty*'. [T]hese ridiculous remake levels will no longer be tolerated. *You were warned* and apparently some of you ignored me.

*Id.*

Comfort Dental's imposition of remake penalties continues unabated. In December 2013, Comfort Dental's Executive Vice President warned all Comfort Dental dentists about "record" remake percentages and that "21 offices exceeded the 10% remake limit set by RK [Rick Kushner]. *You are all flirting with FIRE* . . . If you don't take action, *PENALTIES will ensue*, and your life will continue to be frustrating." [Dkt. # 1, Ex. I].

10

Comfort Dental's ongoing demands— that Plaintiffs and their dentists refer exclusively to the Comfort Dental Labs—and its ongoing imposition of "severe penalties" such as "remake fines" and franchise termination, are supported not only by threats from its CEO and senior management, but also by the drastic remedy in the Subfranchisee Agreement which permits Comfort Dental to immediately terminate such agreement, without any right to cure.  [Dkt. # 1, Ex. C, § 9.1(a)(8)].

### C.     Gold Plan Program

Comfort Dental offers, and directs CDMO, CDET and their dentists to offer and sell a "Gold Plan" to its dental patients.  The Gold Plan, as set forth on Comfort Dental's website and in a form Gold Member Agreement, is described as "reduced fee dental membership plans that allow individuals and groups to receive quality dental care at reduced prices."  [Dkt. # 1, Ex. K].

Under the Gold Plan, members pay a monthly fee in exchange for free dental examinations, the provider's lowest fee rate, and a capitation.  [Bahr Decl., ¶ 31].  Comfort Dental mandates that CDMO, CDET and their dentists in all states in which they operate, sell and advertise the Gold Plan to their patients using only approved advertising copy, all of which has been prepared by Comfort Dental and all of which advertises the Gold Plan.  [Bahr Decl., ¶ 32, Ex. K-1].  Comfort Dental directs CDMO, CDET and Comfort Dental dentists to sell the Gold Plan by various written and oral demands, which come in the form of direct e-mail or other written communications, through office visits, and through demands that Gold Plan materials be included in all advertising copy.  *Id.*

11

Nothing in Comfort Dental's website, advertising, or marketing materials provided by Comfort Dental states whether the Gold Plan is registered in any state, or compliant with state laws. [Dkt. # 1, Ex. K]. Starting in November 2013, Plaintiffs and their counsel began making inquiries with Comfort Dental about the legality of the Gold Plan. [Bahr Decl., ¶ 33].

On November 13, 2013, after Plaintiffs' counsel preliminarily discussed the Gold Plan with Comfort Dental's counsel, Graig Bears, Dr. Kushner emailed Plaintiffs' counsel, directing them not to speak to Mr. Bears, and stating that, "because of [Mr. Bears] actions in this matter, his future is quite in jeopardy and it is likely that by the time you do speak with me in person, Graig will no longer be my employee." [Bahr Decl., ¶ 33, Ex. L]

In December 2013, CDMO and CDET asked Comfort Dental's general counsel, Graig Bears, to provide assurances that Comfort Dental's Gold Plan could be sold and marketed in compliance with Missouri law. [Dkt. # 1, Ex. J]. Despite further requests to Mr. Bears, neither he nor Comfort Dental has, to date, provided any such assurances.

To the contrary, on February 21, 2014, Comfort Dental circulated to CDMO, CDET and other Comfort Dental dentists, a letter reviewing the Gold Plan which had been prepared by its legal counsel, Brent Haden ("Haden Letter"). [Dkt. # 1, Ex. G]. In the Haden Letter, Mr. Haden stated that Comfort Dental is "currently in discussions with the Missouri Department of Insurance regarding the appropriate registration classification for the Gold Plan." *Id*. The Haden Letter continued: "The Gold Plan will now be registered as a 'discount medical plan' under state law, per our discussions with the Department of Insurance's regulators." *Id*. The Haden Letter stated Comfort Dental was working to submit all information to Missouri by the end of February,

12

but conceded that the Gold Plan had not been registered in Missouri during the time Comfort Dental had been requiring Plaintiffs and their dentists to market it. *Id.* It did not indicate whether the Gold Plan had been registered in any other state, nor did it or Comfort Dental advise whether the Gold Plan conformed with Indiana or Kentucky law. *Id.*

Although Comfort Dental's lawyer admitted the Gold Plan was not registered, Comfort Dental still demanded it be sold. *Id.* Indeed, in the very e-mail message transmitting the Haden Letter to Plaintiffs, Dr. Kushner, on February 21, 2014, demanded in writing that CDMO, CDET, and all Comfort Dental dentists continue selling the Gold Plan. *Id.* Dr. Kushner not only demanded the unregistered Gold Plan be sold, but threatened that failure to do so would "violate your franchise agreement[.]" *Id.*

On February 24, 2014, Dr. Craig Bahr, on behalf of CDMO and CDET, responded to the Kushner Demand Letter, again inquiring whether and when the Gold Plan would be registered in any state. [Bahr Decl., ¶ 38]. Despite this further written request for information, neither Comfort Dental nor Mr. Haden has ever informed Plaintiffs whether the Gold Plan has been registered in Missouri or any other state. [Bahr Decl., ¶ 38]. Plaintiffs believe the Gold Plan remains out of compliance with, and/or unregistered as, a discount medical plan in Missouri and Indiana, among other states.

## III.   ARGUMENT

Plaintiffs seek a preliminary injunction prohibiting Comfort Dental from enforcing the illegal terms of the MLRP or Gold Plan Program, prohibiting Comfort Dental from demanding that Plaintiffs engage in potentially illegal conduct, or penalizing Plaintiffs through monetary

fines, franchise termination or other sanctions.  Because Comfort Dental's enforcement demands are both illegal and against public policy, they threaten immediate, ongoing, serious, and irreparable harm and should be preliminarily enjoined.

### A.    Relevant State Laws and Regulations

1.    Corporate Practice of Dentistry and Control of Professional Judgment

Missouri dental practice laws prohibit licensed dentists from surrendering their independent professional judgment, by contract or otherwise, to a person not licensed to practice dentistry in the state. *See* Mo. Am. Stat. § 332.081(4) (West 2014) ("A dentist shall not enter into a contract that allows a person who is not a dentist to influence or interfere with the exercise of the dentist's independent professional judgment.").[4]  Missouri law under which CDMO operates, provides, in relevant part, that one who "[c]ontrols, influences, attempts to control or influence, or otherwise interferes with the dentist's independent professional judgment regarding the

---

[4] "In actions in which jurisdiction is based on diversity of citizenship, the substantive law of the forum state applies, including its choice of law rules." *O'Toole v. Northrop Grumman Corp.*, 305 F.3d 1222, 1225 (10th Cir. 2002); *Moore v. Subaru of Am.*, 891 F.2d 1445, 1448 (10th Cir. 1989). "Colorado has adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws for resolving choice of law questions in contract actions. *Wright v. Martek Power, Inc.*, 314 F. Supp. 2d 1065, 1067-68 (D. Colo. 2004).  "Under this approach, the law of the state chosen by the contracting parties to govern their contractual rights and duties will be applied *unless:* (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (2) 'application of the law of the chosen state would be contrary to a fundamental policy of a state' whose law would govern the parties' dispute in the absence of an effective choice of law by the parties." *Id.* (citing Restatement (Second) of Conflict of Laws § 187(2); *see Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003); *Hansen v. GAB Business Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994)).  Colorado's choice of law rules do not affect the illegality or unlawfulness of the actions in the states of operation.  Principles of comity require that Colorado courts give effect to a sister state's construction of its own statutes. *U.S. Fid. & Guar. Co. v. Indus. Comm'n.*, 61 P.2d 1033, 1034 (Colo. 1936) ("Texas has construed her own law and comity binds us."); *Denver & R. G. R. Co. v. Warring*, 86 P. 305, 306 (Colo. 1906).

4818-6549-3529.8

diagnosis or treatment of a dental disease, disorder, or physical condition" engages in the practice of dentistry.  Mo. Ann. Stat. § 332.071(11) (West 2014).[5]

Indiana dental practice laws likewise provide that a person or entity engages in the prohibited, unlicensed practice of dentistry by directing or controlling the use of dental equipment or dental material while the equipment or material is being used to provide dental services or directs, controls, or otherwise interferes with a dentist's clinical judgment. Ind. Code Ann. § 25-14-1-23(11) and (12) (West 2014).

Kentucky law operates to prohibit corporations or other non-licensed persons from attempting to dictate or influence dentists' independent medical judgment and clinical practice. See *Kendall v. Beiling*, 175 S.W.2d 489, 493 (1943) ("neither a corporation nor any other unlicensed person or entity may engage, through licensed employees, in the practice of medicine or surgery, dentistry, or any of the limited healing arts").  Corporations, such as Comfort Dental, cannot be licensed in Kentucky, and therefore, cannot practice dentistry in that state.  *See* Ky. Rev. Stat. Ann. § 313.070(1) (West 2014) (A person who is not licensed or registered to do so . . . shall not practice as a dentist, dental hygienist, or dental assistant).  Comfort Dental, through the control it exerts over the Plaintiffs is practicing dentistry without a license and is therefore in violation of Kentucky law.  At a minimum, corporations cannot dictate or influence dentists' clinical practice (*see* KY. Rev. Stat. Ann. § 313.010(11); *Com. v. Goodman*, No. 2001-CA-000694-MR, 2001-CA-000775-MR, 2003 WL 1255695 (Ky. Ct. App. Feb. 7,

---

[5]   See also Mo. Ok. Stat. § 332.321 (West 2014) (listing disciplinary actions available to the Missouri board of Dentistry).

2003) (affirming a dental board's decision that only a licensed dentist can perform tasks which require the professional judgment and skill of a dentist).

These state laws forbid licensed dentists from entering into certain types of contracts, and prohibit unlicensed persons or corporations from doing so as well.  The essential prohibition is directed at outside control of a dentist's clinical judgment: the dentist may not surrender control of his/her judgment, and the non-licensed person may not exert such control.  The law in all states in which Plaintiffs conduct their businesses prohibits a dental licensee from surrendering his/her clinical judgment to another, and forbids a non-licensee (such as Comfort Dental) from exerting such control.  Mo. Ann. Stat. § 332.071; Ind. Code Ann. § 25-14-1-23(11) and (12)

Although no courts in Missouri, Indiana or Kentucky have construed these provisions of their dental practice law, several Texas courts have interpreted Texas' nearly identical Dental Practices Act.  For example, in *Penny v. Orthalliance, Inc.*, 255 F. Supp. 2d 579, 583 (N.D. Tex. 2003) the district court analyzed an orthodontic dental franchise's contractual relationship to determine whether it illegally granted excessive control to the franchisor, thereby allowing it to practice dentistry without a license.  In *Penny,* the court first noted that:

> "A person practices dentistry if, among other things, he or she "owns, maintains, or operates an office or place of business in which the person employs or engages under any type of contract another person or persons to practice dentistry . . . "A person without a valid license issued by the Texas Board of Dental Examiners cannot own, maintain, or operate an office in which the person employs under any type of contract another person to practice dentistry.  The language of the TDPA is clear and broad.   "Owns, maintains, or *operates*" are well defined and commonly understood terms, and the legislature's use of the disjunctive "or" signifies that engaging in any of the three actions violates the provision.  Further, the unambiguous language of the statute prohibits a dentist's employment or engagement under *any* type of contract at an office owned, maintained, or operated by non-licensed persons . . . The Court finds the use of the word "any" to

16

> be significant . . . The legislature's deliberate wording of the TDPA indicates its *intent to broadly prohibit a dentist's employment or engagement by a non-licensed person.*

*Id.* at 581-82 (emphasis added.)

The court further described that, under the Texas statute:

> "To operate is defined as "to control the functioning of; run" or "to conduct the affairs of; manage." *Id.* In the [Franchise] Agreements, Orthalliance contracted to provide the Practice Groups with comprehensive practice management. As part of this comprehensive management, Orthalliance *controls the functioning of, runs, conducts the affairs of, and manages the orthodontic offices* . . . Indeed, the express purpose of the Service Agreements is to allow Orthalliance to control the functioning of . . . the orthodontic offices.

*Id.* at 582-83 (emphasis added.) After construing the various franchise agreements at issue, the court in *Penny* concluded that "The Agreements, when construed together, result in [franchisor] engaging or obtaining the services of the [Plaintiffs]" and declared those agreements void and illegal in their entirety. *Id.* at 583. Like the franchise agreements at issue in *Penny*, the mandates imposed by Comfort Dental under its MLRP attempt impermissibly to control the Plaintiffs' practices, interfere with the dentists' independent professional judgment and medical treatment of their patients and, as such, are contrary to the laws of Missouri, Indiana, and Kentucky.

      2.    Insurance Laws Related to Discount Medical Plans and Prepaid Dental Plans[6]

As noted, Comfort Dental demands that Plaintiffs and their Comfort Dental dentists advertise and sell the Gold Plan in Missouri and Indiana, among others. Those states require

---

[6] While there has been no formal determination that the Gold Plan is either a "discount medical plan" or a "prepaid dental plan . . . or other insurance product, Comfort Dental's counsel represented to Plaintiffs that it was a "discount medical plan." [Dkt. # 1, Ex. G] In any event, whether the Gold Plan is a discount medical plan or a prepaid dental plan, Comfort Dental should have registered, but did not register, with the state to advertise and market the Gold Plan. Mo. Ok. Stat. § 376.1502; Ind. Code Ann. § 27-17-2-1.

registration of the Gold Plan as a discount medical plan, and penalize unregistered sales.

Missouri law provides that: "It is unlawful to transact business in this state as a discount medical plan organization, unless the organization . . . *is registered as* a discount medical plan organization with the director or duly authorized by the director as an insurance company, licensed health maintenance organization, licensed group health service organization, or licensed third-party administrator."  Mo. Ok. Stat. § 376.1502 (West 2014).  (emphasis added)  Likewise, "A prepaid dental plan may not be established or operated in this state, nor may membership be solicited in such a plan unless the plan is offered by a prepaid dental plan corporation *licensed under sections 354.700 to 354.723.*"  Mo. Ok. Stat. § 354.702(1) (West 2014).  Penalties for violations include monetary penalties per violation of $1000, up to an aggregate annual penalty of $50,000.  Mo. Ok. Stat. § 376.1532, 374.049 (West 2014).

In Indiana, "[a] discount medical card program organization may not transact business in Indiana unless the discount medical card program organization is (1) authorized to transact business in Indiana; and (2) *registered under this chapter.*"  Ind. Code Ann. § 27-17-2-1 (West 2014).  (emphasis added).  Marketers in Indiana face even more hurdles.  With regard to marketers, "[a] discount medical card program organization (1) shall enter into a written agreement with a marketer before the marketer may begin marketing, promoting, selling, or distributing the discount medical card program; and (2) is responsible and financially liable for any acts of the discount medical card program organization's marketers that do not comply with this article."  Ind. Code Ann. § 27-17-12-2.  Violations of the Discount Medical Plan statutes

4818-6549-3529.8

authorize civil penalties of at least five hundred dollars and not more than fifty thousand dollars per violation.  Ind. Code Ann. § 27-17-14-1.

**B.      Legal Standard for Issuance of a Preliminary Injunction.**

As an equitable remedy, a preliminary injunction invokes the sound discretion of the district court.  *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001). "Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

With respect to irreparable harm, the claimed injury "must be certain, great, actual and 'not theoretical.'"  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  "To satisfy the irreparable harm requirement, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact.'"  *Entek GRB, LLC v. Stull Ranches, LLC*, 885 F. Supp. 2d 1082, 1095 (D. Colo. 2012) (quoting *Greater Yellowstone Coal. V. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  The moving party must demonstrate that denying the injunction would cause it greater harm than would be caused the non-moving party were the injunction granted.  *Doubleclick, Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1260 (D. Colo. 2005).

"[W]here the remedy at law is inadequate, an injunction will issue in a proper case to restrain the performance or enforcement of contracts that are illegal or against public policy.  A

19

temporary injunction may issue against the enforcement of a contract while the contract's validity is in dispute." 42 Am. Jur. 2d *Injunctions* § 117.  *See The Bd. of Regents of the Univ. Of Okla. v. Nat'l Collegiate Athletic Ass'n*, 546 F. Supp. 1276 (W.D. Okl. 1982) (granting injunctive relief forbidding implementation of contracts that were void in violation of antitrust laws); *Dawson v. Woodhams*, 53 P. 238, 239 (Co. App. 1898) ("The contract itself is wholly illegal and void, and a judgment of permanent injunction preventing its execution should have been entered.").

### C.   The Court Should Grant Injunctive Relief Because Plaintiffs Have Established All Four Factors Authorizing A Preliminary Injunction

#### 1.   Plaintiffs Have a Substantial Likelihood of Success on the Merits with Respect to the Specifically Identified Provisions of the Contract

Comfort Dental has repeatedly sought, through threatened termination and "severe penalties" under the Subfranchisor Agreements, to force Plaintiffs to engage in illegal acts in multiple states, or compel their subfranchisees to engage in such acts.  Because enforcement of these provisions would require Plaintiffs to engage in or demand illegal activity, it is clear that Plaintiffs will prevail on the merits.

"[I]f the contract whose enforcement is here sought is contrary to public policy, it is illegal and void and the courts will have nothing to do with it."  *Metro. Life Ins. Co. v. Roma*, 50 P.2d 1142, 1143 (Colo. 1935) (citing 13 C. J. § 342, p. 412; 6 R. C. L. § 123, p. 715).  "[I]t is immaterial whether information of such illegality comes from plaintiff or defendant, or is disclosed by pleadings or evidence."  *Id.  See also F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 843 P.2d 1285, 1290 (Colo. 1992). ("It is a long-standing principle of contract law that a contractual

20

provision is void if the interest in enforcing the provision is clearly outweighed by contrary public policy"); *R.P.T. of Aspen, Inc. v. Innovative Commc'ns, Inc.*, 917 P.2d 340, 342 (Colo. App. 1996) ("Contracts in violation of statutory prohibitions are void"); *Mason v. Orthodontic Crs. of Colo., Inc.*, 516 F. Supp. 2d 1205, 1219 (D. Colo. 2007) (finding portions of a contract that required non-dentist proprietors to engage in fee sharing with dentists, and thus to engage in the practice of dentistry, to be void as against public policy).  "We have not hesitated to apply this principle to terms and conditions of insurance contracts which undermine legislatively expressed policy." *F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 843 P.2d 1285, 1290 (Colo. 1992) (household exclusion in automobile liability policy held invalid as contrary to public policy expressed in Colorado Auto Accident Reparations Act); *Newton v. Nationwide Mut. Fire Ins. Co.,* 594 P.2d 1042, 1046 (Colo. 1979) (insurance policy provision which permitted insurer to subtract PIP payments from uninsured motorist coverage so as to reduce that coverage to less than statutory minimum violative of public policy in Colorado Auto Accident Reparations Act).

In determining whether a contract is void as against public policy, Colorado courts consider the following factors from the Restatement of Contracts: "(i) the parties' justified expectations; (ii) any forfeiture that would result if enforcement were denied; (iii) any special public interest in the enforcement of a particular term; (iv) the strength of the public policy at issue; (v) the likelihood that refusal to enforce the agreement will further that interest; (vi) the seriousness of the misconduct involved and its willfulness; and (vii) the directness of the connection between the misconduct and the agreement." *Mason v. Orthodontic Ctrs. of Colo., Inc.*, 516 F. Supp. 2d 1205, 1215 (D. Colo. 2007).

21

In the *Mason* case, a group of dentists and corporations entered into an agreement to "supply various dental office management services . . . to the Plaintiffs in exchange for a percentage of the office's profits." *Id* at 1208. Eventually the dentists filed suit, seeking to void the agreement as against public policy. Employing the Restatement test, Judge Krieger held that contract provisions allowing fee-sharing were void as against public policy. *Id*. at 1210-1219. After examining the relevant agreements under the Restatement test, the court declared the contracts void: "The public interest is a strong one, and the conduct contemplated by the Agreement directly contravenes the purposes that the public policy advances. Although voiding the contract works some degree of inequity upon the Defendants, they are not unreasonably prejudiced, as the law likely permits them to recover the reasonable value of the services they have provided to the Plaintiffs. *Mason*, 516 F. Supp. 2d at 1217. "[C]ontracts in violation of statutory prohibitions are void" *R.P.T. of Aspen, Inc. v. Innovative Commc'ns, Inc.*, 917 P.2d 340, 342 (Colo. App. 1996) (reversing and remanding an affirmation of arbitrator's award that contained a finding that the contract was not illegal to the District Court to determine whether a contract provision violated Colorado antitrust laws).

In *Penny v. Orthalliance, Inc.*, described above, the United States District Court for the Northern District of Texas reached a similar conclusion. 255 F. Supp. 2d 579, 582 (N.D. Tex. 2003). Based on the finding that the franchisor effectively controlled the individual orthodontists under their franchisor agreements, the court held "[t]he Agreements, when construed together, result in Orthalliance engaging or obtaining the services of the Individual Plaintiffs," and found the contracts to be illegal in their entirety and void. *Id.* at 583. *See also In re OCA, Inc.*, 552

22

F.3d 413 (5th Cir. 2008) (because OCA was committing an illegal act by practicing dentistry without a license according to Texas statutes and the business services agreement, the Fifth Circuit affirmed the BSAs were illegal and void)

Because the Subfranchisor Agreements contravene the laws of Missouri and Indiana, and there is a strong likelihood the Subfranchisor Agreements will be found void.[7]

> a.  There is a Strong Likelihood the MLRP Provision Will Be Found Void as Illegal and/or as Against Public Policy

The provisions of the Subfranchisor Agreements related to the MLRP are illegal and/or unlawful and thus void. Because Comfort Dental seeks through these agreements to control the independent judgment of its dentists, these provisions are illegal.

> (1)  The MLRP Provision Will Be Found Void as Illegal

Section 13.2 of the Subfranchisor Agreements mandates that all Comfort Dental dentists refer all dental laboratory work to the Comfort Dental Labs. [Dkt. # 1, Ex. A, § 13.2; Ex. B, § 13.2]. Other provisions seek to control virtually all aspects of the practice of dentistry [Bahr. Decl. ¶ 20]. These mandates seek to remove the individual practitioners' professional clinical judgment and control and surrender it contractually to Comfort Dental. Comfort Dental exerts additional control by imposing remake "penalties or fines" when dentists exercise their independent clinical judgment to reject a defective Comfort Dental Lab device that could harm their patient.

---

[7] Although Kentucky law does not contain a comparable registration requirement for prepaid dental plans, the Subfranchisor Agreements between CDET and Comfort Dental, which grant franchises in Kentucky and Indiana, are nevertheless illegal because: 1) both Kentucky and Indiana law prohibit the MLRP program, 2) Indiana law requires registration of the Gold Plan, 3) Plaintiffs operate under one Subfranchisor Agreement for both Indiana and Kentucky and the MLRP's illegality as to one state renders the provision illegal and void as to all states.

In the states where Plaintiffs operate, the Subfranchisor Agreements and Comfort Dental's enforcement of same are illegal. *See e.g.* Mo. Ann. Stat. § 332.071(ii) (one who "[c]ontrols, influences, attempts to control or influence, or otherwise interferes with the dentist's independent professional judgment regarding the diagnosis or treatment of a dental disease, disorder, or physical condition" engages in the practice of dentistry); *See,* Ind. Code Ann. § 25-14-1-23(11) and (12) (a person or entity engages in the prohibited, unlicensed practice of dentistry by directing or controlling the use of dental equipment or dental material while the equipment or material is being used to provide dental services or directs, controls, or otherwise interferes with a dentist's clinical judgment; *Com. v. Goodman*, No. 2001-CA-000694-MR, 2001-CA-000775, 2003 WL 1255695 (Ky. Ct. App. Feb. 7, 2003) (affirming a dental board's decision that only a licensed dentist can perform tasks which require the professional judgment and skill of a dentist)).[8]

Under the above-referenced laws, enforcement of the MLRP would be illegal, because it seeks to require Plaintiffs to surrender their professional judgment and relinquish control to Comfort Dental.  For the same reason, Comfort Dental's enforcement of the MLRP may also constitute the practice of dentistry without a license by Comfort Dental.  *See* Ky. Rev. Stat. Ann. § 313.070; Mo. Ok. Stat. § 332.081; Ind. Code Ann. § 25-14-1-1.  Therefore, the Subfranchisor Agreements are void.

---

[8] Missouri law provides that "[a]ny person who practices dentistry as defined in section 332.071 . . . who is not duly registered and currently licensed in Missouri as hereinafter provided is guilty of a class A misdemeanor."  Mo. Ok. Stat. § 332.111 (West 2014).  Similarly, Indiana law states "[i]t is a Class D felony for a person to . . . [p]ractice dentistry not being at the time a dentist duly licensed to practice as such in this state under this chapter[.]"  Ind. Code Ann. § 25-14-1-25.  Kentucky likewise provides "[a] person who violates subsection (1)(a), (b), (c), or (d) of this section [relating to the unlawful practice of dentistry] shall be guilty of a Class B misdemeanor for a first offense and a Class A misdemeanor for each subsequent offense.  Ky. Rev. Stat. Ann. § 313.080 (West 2014).

(2)     The MLRP Provision Is Also Void as Against Public Policy

The Subfranchisor Agreements would be also void as against public policy under the Colorado Restatement (Second) test articulated in *Mason*, 516 F. Supp. 2d at 1215.  Analysis of these factors compels the conclusion that the challenged provisions would frustrate public policy in numerous particulars.

Examination of the first two Restatement factors—the parties' expectations and any forfeiture[9] from denying enforcement of the agreement—weighs in favor of voiding the Subfranchisor Agreements.  As the court held in *Mason*, even assuming the parties may have legitimately expected performance, there would be no forfeiture if the contracts were voided since—assuming Comfort Dental "[could] show [its] own conduct was proper"—it could seek recovery for work actually performed.  *Id*. at 1215.

Review of the remaining Restatement factors confirms that the Subfranchisor Agreements here should be void.  First, Colorado public policy relating to the dental profession supports "avoiding non-professional interference in professional decision-making."  516 F. Supp. 2d at 1216-17.  ("The public interest is a strong one, and the conduct contemplated by the Agreement directly contravenes the purposes that the public policy advances.")  As has been shown, the Subfranchisor Agreements directly interfere in dentists' decision-making not only as to referrals for laboratory services, but in a range of other professional decisions affecting dental

---

[9] "A court will not enforce a contract that violates public policy even if the failure to do so is "unfair" to one of the parties: 'Countless instances might be cited where because of the refusal to enforce contracts which are against public policy one of the parties is left in a peculiarly advantageous position, or the contrary.'"  *Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo. App. 2002).

25

patients.  [Dkt.# A, §§ 4.2, 4.4, 7.1, 13.1, 13.4, 14.1; Ex. B §§ 4.2, 4.4, 7.1, 13.1, 13.4, 14.1].

That public policy interest exists under Colorado law, but also under the laws of Missouri,

Indiana and Kentucky where CDMO and CDET dentists practice and hold their licensure.  [*See,*

Mo. Ann. Stat. § 332.071; *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 277 S.W.3d

686, 695 (Mo. Ct. App. 2008)(finding statute regulating dentists to be a public policy of the state

of Missouri); Ind. Code Ann. § 25-14-1-23(11) and (12); *Trotter v. Nelson*, 684 N.E.2d 1150,

1152-53 (Ind. 1997) *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind.

2007) ("In the past, Indiana courts have noted that we first look to the Constitution, the

legislature, and the judiciary for explicit declarations of public policy); *Com. v. Goodman*,

No. 2001-CA-000694-MR, 2001-CA-000775-MR, 2003 WL 1255695 (Ky. Ct. App. Feb. 7,

2003) (affirming a dental board's decision that only a dentist can perform tasks which require the

professional judgment and skill of a dentist).]  Because refusal to enforce the Subfranchisor

Agreements would further these states' interests in maintaining the independence of clinical

decision-making and protecting the dental health of patients, these provisions, should be voided

as against public policy.

b.      There is a Strong Likelihood the Gold Plan Provision Will be
        Found Void

The Subfranchisor Agreements require Plaintiffs to "comply with . . . all mandatory

specifications, standards and operating procedures[.]"  [Dkt.# 1, Ex. A, § 13.4; Ex. B § 13.4].

One such mandatory specification is the "Gold Plan."

The Gold Plan, as described above, is a "reduced fee dental membership plan[] that

allow[s] individuals and groups to receive quality dental care at reduced prices."  [Dkt.# 1,

26

Ex. K].  Such a plan implicates the insurance laws of the states in which Plaintiffs operate.  In

states in which Plaintiffs operate under the Subfranchisor Agreements, the Gold Plan must be

registered.[10]  However, as noted above, Comfort Dental admittedly has failed to register with any

state, while at the same time threatening to terminate their franchises if Plaintiffs do not sell the

Gold Plan to their patients.  [Dkt.# 1, Ex. G].  By forcing Plaintiffs and their dentists to market

the Gold Plan, Comfort Dental seeks to compel Plaintiffs to commit potentially illegal acts.

Because requiring Plaintiffs to comply with sections 13.2 and 13.4 of the Subfranchisor

Agreements would require Plaintiffs to commit illegal acts, the Subfranchisor Agreements are

void as illegal and as against public policy.

> 2.     Plaintiffs Will Suffer Irreparable Harm to Plaintiffs if the MLRP and Gold
>        Plan Provisions Were Enforced.

Irreparable harm represents "harm that could not be adequately compensated by damages,

or averted by a decision on the merits, at the permanent injunction stage, or limited by other

available relief."  1 Dan B. Dobbs, *Dobbs v. Law of Remedies* § 2.11(2), (2d ed. 1993) "We have

previously held that a plaintiff satisfies the irreparable harm requirement by demonstrating 'a

significant risk that he or she will experience harm that cannot be compensated after the fact by

monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  ("In

determining 'whether a plaintiff has made the requisite showing, we further assess whether such

harm is likely to occur before the district court rules on the merits.")'  *Id*.  Absent a preliminary

injunction, Plaintiffs would suffer immediate irreparable injury, including termination of their

---

[10] *See* Mo. Ann. Stat.  § 376.1502(1); Mo. Ann. Stat.  § 354.702(1);  Ind. Code Ann. §  27-17-12, sec. 1,2; Ind. Code Ann. §  27-13-34-8; *Kendall v. Beiling*, 175 S.W.2d 489, 493 (Ky. 1943).

25-year franchises, irreparable harm to their relationships with patients, damage to their reputations and risk to their professional and licensure and standing.

"Courts have recognized that the threatened loss of a franchise business before the lawfulness of a termination can be determined constitutes irreparable harm sufficient to warrant injunctive relief." *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1247 (D. Colo. 2007).  In the *Bray* case, "[e]ight sandwich shop franchisees filed [a] lawsuit . . .  alleging wrongful termination of their franchise agreements by QFA Royalties LLC ("Quiznos")."  *Id*. at 1239. The sandwich shop owners were members of the Toasted Subs Franchise Associate ("TFSA"), and the TFSA posted a note regarding the suicide of a former Quiznos franchisee after protracted litigation with Quiznos.  In determining whether the franchisees were entitled to a preliminary injunction, the District of Colorado determined that the: "immediate terminations ordered by Quiznos would effectively close Plaintiffs' stores completely pending trial, resulting in a loss of customer base and community goodwill going beyond 'simple economic loss.'" *Id. at* 1249. Thus, the court therefore found the franchisees had made a strong showing of irreparable harm. *Id*.  *See also* (*Wojciechowski v. Amoco Oil Co.*, 483 F. Supp. 109, 112 (E.D. Wis. 1980) ("The law is very clear that the loss of a franchise is an irreparable harm, and thus legal remedies are inadequate"); *Roso-Lino Beverage Distrib., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125-26 (2d Cir. 1984) ("The loss of Roso-Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm").

In this action, Comfort Dental has repeatedly, and recently, threatened to terminate Plaintiffs' franchise for failing to follow Comfort Dental's improper demands. [Dkt.# 1, Ex. F, G, H, I]. Because loss of a franchise cannot be compensated by an award of damages, the harm promised by Comfort Dental is irreparable.[11]

Damage to the physician/patient relationship also constitutes irreparable harm. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 861 F. Supp. 2d 1170, 1187-88 (D. Haw. 2012) *aff'd*, No. 12-15624, 2014 WL 689748 (9th Cir. Feb. 24, 2014) (harm to the doctor-patient relationship, relationships with referring physicians through whom the doctor establishes a client base, and the deprivation of the opportunity to compete for potential patients are all harms that cannot be remedied through an award of damages and thus constitute irreparable harm). *See also Fairfield Cnty. Med. Ass'n v. United Healthcare of New England*, No. 3:13-CV-1621 SRU, 2013 WL 6334092 at *7 (D. Conn. Dec. 5, 2013) *aff'd as modified sub nom. Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, Inc.*, No. 13-4608-CV, 2014 WL 485933 (2d Cir. Feb. 7, 2014) ("disruption of the physician-patient relationship can cause irreparable harm that justifies issuing preliminary injunctive relief"). Here, Comfort Dental threatens patient relationships not only by interfering with the dentists' clinical judgments, but also by threatening termination of Plaintiffs' franchise. Such harm cannot be remedied and is therefore irreparable.

---

[11] "Nothing herein shall prevent . . . Subfranchisor from seeking injunctive relief in appropriate cases to prevent irreparable harm."; [Dkt. #1, Ex. A, § 20.4]; Ex. B, § 20.4]. "Therefore, Subfranchisee agrees . . . that if Subfranchisee or its affiliates are in default of this Agreement, or in the event of threatened breach by Subfranchisee or its affiliates of any of the provisions of this Agreement, Master Franchisor and Subfranchisor shall have the immediate right, without notice to Subfranchisee or its affiliates, to secure an order enjoining any such default or threatened breach[.]" [Dkt.#1, Ex. C, § 12.6].

Negative publicity and damage to reputation associated with licensure sanctions or other adverse actions represents irreparable harm. *See Housworth v. Glisson*, 485 F. Supp. 29, 35 (N.D. Ga. 1978) (plaintiffs showed irreparable harm specifically from the injury to their businesses caused by the publicity attending business license revocations)*See also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1157 (10th Cir. 2001) (no remedy could repair the damage to Dominion's reputation and credibility from Defendants refusal to comply with contract terms related to activating satellite customers). Because potential regulatory sanctions and attendant adverse publicity would be caused by enforcement of the Subfranchisor Agreements, that harm is irreparable.

Finally, loss of goodwill often constitutes irreparable harm. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied); *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007) (finding irreparable harm where manufacturer attempted to terminate an exclusive distributor agreement and finding, "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill . . . [t]hus, these type of injuries are presumed irreparable"). Comfort Dental's conduct here threatens not only damage to Plaintiffs' reputation, but loss of the goodwill of their respective businesses and professions if regulatory action were taken as a result of Comfort Dental's demands under the Subfranchisor Agreements, or if Comfort Dental terminated them.

30

Clearly, the Plaintiffs will suffer irreparable harm if the Court does not enjoin enforcement of the Subfranchisor Agreements.  If Comfort Dental were allowed to enforce adherence to the MLRP and Gold Plan provisions, Plaintiffs would be forced to engage in potentially illegal acts in the states in which they operate.  Regulatory agencies could potentially sanction or prohibit Plaintiffs and/or their subfranchisee dentists from practicing dentistry.  The threat to the continuing operation of Plaintiffs' business operations is real and imminent. Plaintiffs have demonstrated a likely threat of irreparable harm and the Court should grant the motion for a preliminary injunction.

> 3.    The Balance of Harms and the Public Interest Favors Issuing a Preliminary Injunction.

The balance of harms strongly supports entry of an injunction.  On the one hand, if Comfort Dental's conduct continued, Plaintiffs would likely suffer civil penalties, permanent damage to their patient relationships, potential physical harm to their patients, and loss of their professional reputations and franchises.  Entry of an injunction, at most, might cause Comfort Dental to suffer minor financial loss resulting from the cessation of its illegal activities, the Comfort Dental Labs thereby being required, for the first time, to compete for business on the basis of quality and cost with other dental laboratories (rather than being able to rely on a stream of compulsory referrals).  Although denial of an injunction could cause permanent, irreparable harm to Plaintiffs, granting the injunction would cause Comfort Dental little if any harm that is irreparable.[12]  The balance of harms indisputably favors granting a preliminary injunction.

---

[12] As Judge Krieger noted in *Mason*, any harm a party to a voided agreement suffers would be minimal.  516 F. Supp. 2d at 1216.

31

The public interest would be strongly served by preventing illegal or unlawful activities and by promoting the public policies requiring independent medical judgment and state-regulated sales of dental plans.  "A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past."  *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435, (1941).  "'Public policy,' with respect to the administration of the law, is that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good."  *Russell v. Courier Printing & Pub. Co.*, 95 P. 936, 938 (Colo. 1908).  Preventing the enforcement of Agreements that require illegal and/or unlawful actions would prevent actions that tend to injure the public or are detrimental to the public good.

## IV.    CONCLUSION

Plaintiffs have established a likelihood of success on the merits and have shown they will suffer immediate and irreparable harm from the continued enforcement of the Subfranchisor Agreements.  Therefore, the Court should issue a preliminary injunction.

Dated this 4th day of April, 2014.

Respectfully Submitted

By: */s/ Neil L. Arney*
   Neil L. Arney
   KUTAK ROCK LLP
   1901 California Street, Suite 3000
   Denver, CO 80202
   (303) 297-2400

   Thomas J. Kenny, NE Bar #20022
   Edward M. Fox, II, NE Bar #24601
   KUTAK ROCK LLP
   The Omaha Building
   1650 Farnam Street
   Omaha, NE  68102-2186
   (402) 346-6000

   Attorneys for Plaintiffs CDMO, INC. and
   CDET, INC.

33

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2014 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and served such filing to the following email addresses:

William F. Jones, Esq,
MOYE WHITE LLP
16 Market Square 6th Floor
1400 16th Street
Denver CO 80202-1486
EMAIL: billy.jones@moyewhite.com

*Attorney for Defendant*

*s/ Edna Slagle*

34